**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

FRANK and TINA GALLEGOS,

        Plaintiffs-Counterdefendants,

v.                                                    CV 12-30 MV/CG

ALBUQUERQUE PUBLIC SCHOOLS,
21ST CENTURY PUBLIC ACADEMY,
and BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC SCHOOLS,

        Defendants-Counterplaintiffs.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

THIS MATTER comes before the Court on *Defendants' Motion for Judgment Reversing the Hearing Officer's Decision* ("Motion to Reverse HO's Decision"), filed on July 16, 2012, (Doc. 16); *Plaintiffs' Response to Motion for Judgment Reversing the Hearing Officer's Decision [Doc. No. 16]* ("Response"), filed on August 30, 2012, (Doc. 23); and *Defendants' Reply Brief in Support of Motion for Judgment Reversing the Hearing Officer's Decision* ("Reply"), filed on September 17, 2012, (Doc. 24).

## I.    Background

Plaintiffs-Counterdefendants ("Plaintiffs"), Frank and Tina Gallegos, filed a Request for Due Process with the State of New Mexico Public Education Department on February 16, 2011.  (Hearing Officer's Memorandum Decision and Order[1] ("HO's Decision") at 1).  Plaintiffs' son, F.G., is eligible for special education under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* In their

---

[1] The complete Administrative Record was not filed electronically.  All documents in the Administrative Record will be referred to using their title; page numbers reflect those of the paper copies submitted to the Court.

Request for Due Process, Plaintiffs alleged that F.G. was denied a free appropriate public education ("FAPE") because Defendants Albuquerque Public Schools ("APS") and 21st Century Public Academy ("21st Century"), an APS charter School, failed to fully implement F.G.'s Individualized Education Program ("IEP") from September 2009 through October 25, 2010. (HO Decision at 1; Doc. 23 at 1). A Due Process Hearing was held from October 18, 2011 through October 20, 2011. (HO Decision at 3). The Hearing Officer filed his decision on December 15, 2011, granting Plaintiff's request in part but denying Plaintiff's requests for updated achievement and SLP testing, as well as a request for a facilitated IEP to consider the results of the requested testing. (HO Decision at 3, 21).

Defendants contend that the Hearing Officer erred by 1) failing to apply the standard adopted by the Tenth Circuit to determine whether F.G. received a FAPE in the area of reading; 2) awarding a compensatory education based upon an hour-for-hour calculation rather than a determination of F.G.'s individual needs; 3) wrongfully ordering the school to pay for a private educational evaluation where there was no evidence that Plaintiffs disagreed with the school's evaluation; and 4) finding that APS is liable for the alleged acts or omissions of 21st Century. (Doc. 16 at 1, 3, 17). Plaintiffs argue that Defendants have not shown that the Hearing Officer erred. (Doc. 23 at 2). Both parties turned down an opportunity to supplement the record with additional evidence. (Doc. 29).

 a. *Administrative Record*

F.G. attended 21st Century as a sixth grader for the 2009-2010 school year and

Garfield Middle School as a seventh grader for the 2010-2011 school year.  (HO

Decision at 7; Response at 1).  F.G.'s parents provided 21st Century with F.G.'s March

2009 IEP before the 2009-2010 school year, which also contained an addendum

completed in May of 2009.  (HO Decision at 7-8; Ex. A; Ex. 33).  The 2009 IEP

prescribed ten hours per week of special education services in a segregated, small

group setting.  (Ex. A, 21st0310, 0312).  The IEP also states that F.G.'s reading, writing,

spelling, and math scores placed him at the third grade level.  (Ex. A, 21st0282).

F.G.'s standardized test scores were submitted as exhibits during the hearing.

(Ex. R at 21st 0112-0113).  F.G. took the tests four times over the course of the 2009-

2010 school year, in August, November, March, and apparently a "redo" in May.  (Ex. R

at 21st0112-0113).  In mathematics, his scores increased by five from fall to spring, from

174 to 176 to 179.  (Ex. R at 21st0112).  However, on all three tests, his scores placed

him in the first percentile, lower than the rest of his peers.  (*Id.*).  His reading scores

increased by 7, from 172 to 176 to 179.  (*Id.*). These scores placed him in the first

percentile.  (*Id.*).  In language usage, his scores increased by seventeen, from 173 to

172 to 190; the first two scores placed him in the first percentile while the last placed

him in the fourth percentile.  (*Id.*).  In general science, his scores went from 185 to 166,

and were initially in the fourth percentile but decreased to the first percentile.  (Ex. R at

21st0113).  In concepts and processes, his scores went from 182 to 177 to 186; these

scores place him in the third, first, and fourth percentiles from fall to spring.  (*Id.*).

The profile of F.G. on which his October 2010 IEP was based states that his

reading fluency was at the equivalent of mid-second grade, though other reading skills

3

were at the third grade level.  (Ex. 2 at 1).  His math skills were at the third grade level.
(*Id.*)  The 2010 IEP also states that F.G. must receive reading, writing, and math
instruction in small groups or individually.  (Ex. 2 at 10).

At the Due Process Hearing, Stephanie Kuehn, a special education teacher at
21st Century testified.  (Transcript ("Tr.") at 38-88).  Ms. Kuehn taught a study skills
class, which F.G. attended three days a week during the second semester of the 2009-
2010 school year.  (*Id.* at 38-39; 87).  In the class, Ms. Kuehn primarily helped students
with their homework assignments, but also went over the students' writing and reading
with the students and worked with students individually on reading comprehension.  (*Id.*
at 38-39).

Donna Eldredge, the principal and a special education teacher at 21st Century
during the 2009-2010 school year, also testified.  (*Id.* at 145-228).  Ms. Eldredge taught
F.G. in the Soar to Success curriculum (a reading class) for part of the year.  (*Id.* at 148-
149).  The Soar to Success class consisted of five to six students and was a daily class,
but F.G. was enrolled in it for less than nine weeks before switching to the Wilson
reading class, a replacement for the Soar to Success class.  (*Id.* at 150, 197).  Ms.
Eldredge also testified that the speech and language therapist did not work with F.G.
until November 2, 2009.  (*Id.* at 157).  F.G. initially attended the Wilson reading class
three days a week, but at some point he began attending only two days a week.  (Tr. at
199).

Julianne Glinski, testified as an expert in educational diagnostics and
evaluations.  (*Id.* at 230-283).  Ms. Glinski conducted an evaluation of F.G. at the

request of 21st Century in November of 2009.  (*Id.* at 233-34).  Based on this testing,

Ms. Glinski testified that F.G.'s reading abilities were most similar to an average student

beginning the third grade.  (*Id.* at 239).  Ms. Glinski elaborated on F.G.'s reading scores,

explaining that they ranged from the second percentile on his fluency to the sixteenth

percentile on his phonics skills.  (*Id.* at 240).  She also testified that she had

recommended that F.G. receive multisensory systematic research-driven instruction

daily to address his difficulties in reading; the Wilson reading program meets this

recommendation though Ms. Glinski testified that gaining as much as possible would be

difficult if the program were only provided twice a week.  (*Id.* at 245, 255, 276-77).  Ms.

Glinski testified that the instruction should be provided in a small group with a teacher.

(*Id.* at 245).

        Julia Lowe, an expert in speech and language pathology, testified about the

results of testing and evaluations she did with F.G., as well as her work with him.  (*Id.* at

518-598).  When Ms. Lowe began to work with F.G. using the SRA Corrective Reading

Program in the summer of 2010, the level at which F.G. started was written at a third to

fourth grade reading level.  (*Id.* at 545, 548).  Ms. Lowe also testified that F.G.'s MAPS

reading score in spring of 2009 of 179 was below the second grade level.  (*Id.* at 554).

Ms. Lowe also stated that, to her, a small group would consist of two to five students

with a teacher.  (*Id.* at 555-556).

        Also testifying at the hearing was Erin Johns, who taught science and special

education at 21st Century during the 2009-2010 school year.  (*Id.* 700-730).  Ms. Johns

taught F.G. the Wilson reading program during the 2009-2010 school year, but testified

that she did not remember when she began teaching him, though it was not at the beginning of the school year.  (*Id.* at 705).  She taught F.G. three days a week in the fall and two days a week in the spring.  (*Id.*).  Ms. Johns also testified that F.G. was taught in a small group of six to eight students.  (*Id.* at 706).  F.G. initially began the Wilson reading instruction at a second grade level, but finished at a level that correlates to a fifth grade level, according to Ms. Johns.  (*Id.* at 708).  Halfway through the year, Ms. Johns determined that F.G. was progressing well enough that his instruction time should be reduced to two days a week so that he could be pushed to continue progressing.  (*Id.* at 721).  She testified that while he could follow along with the group at this more difficult level, he struggled when she worked with him individually.  (*Id.* at 722).

### b.  Hearing Officer's Decision

The Hearing Officer's findings of fact included descriptions of F.G.'s 2009 and 2010 IEPs.  (HO Decision at 8-17).  The Hearing Officer cited to Ms. Lowe's testimony in finding that a small group typically consists of two to five students.  (*Id.* at 8).  He also specifically stated that 21st Century provided services to F.G. in an all-inclusive setting and an unsegregated study skills class that provided assistance for his general education homework, changes from the 2009 IEP's prescription of a segregated setting.  (*Id.* at 8-9).  F.G.'s reading instruction was provided in a group of six to eight students, with some individualized instruction, but it was not provided in a "frequency appropriate to meet the Student's needs to satisfy the IEP."  (*Id.* at 9).  The Hearing Officer found that F.G.'s reading was at the third grade level in March and November of 2009, but

6

regressed to the first grade level in March 2010.  (*Id.* at 9).  In February 2010, F.G.
started to receive private tutoring from two tutors in reading, speech and language, and
language arts, the cost of which was $4,220 for Ms. Julia Lowe's services and $2,680
for Ms. Carolyn Lowe's services.  (*Id.* at 10).

The Hearing Officer made several factual findings regarding F.G.'s math, writing,
and language/speech skills, including that F.G. received four to six minutes of one-on-
one math time with the teacher per fifty minute class period, but it was not in a small
segregated class; that F.G.'s study skills and English as a second language classes
were not a substitute for special education services in a segregated special education
setting; and that F.G. did not receive the prescribed occupational therapy until February
4, 2010.  (*Id.* at 10-13).  F.G. had a private SLP evaluation in February 2010, but not
because his parents disagreed with the school's evaluation.  (*Id.* at 13).  However, the
2010 IEP did rely on the private evaluation.  (*Id.*).

The Hearing Officer found that the March 2009 IEP showed that a re-evaluation
was due in August 2009.  (*Id.* at 14).  F.G.'s parents were contacted on January 20,
2010 to participate in an IEP meeting on February 2, 2010, but this was cancelled
because Mr. Gallegos would be out of town.  (*Id.*).  The meeting was ultimately held on
March 10, 2010 after 21st Century tried to reschedule it twice in February.  (*Id.* at 14-15).
An IEP was never completed by 21st Century; F.G. transferred to a new school for the
2010-2011 school year.  (*Id.* at 15).

The Hearing Officer specifically found that the lack of provision of "special
education and related services prescribed by [F.G.'s] March 20, 2009 IEP caused him

7

educational harm by creating larger gaps between the Student and his peers and by creating gaps in his study skills." (*Id.* at 16). He also found that the LEA, through 21st Century, unilaterally altered or changed F.G.'s IEP without prior notice to the parents; that the full inclusion program did not comply with the procedures set forth in the IDEA; and that the LEA failed to implement the March 2009 IEP, which did not comply with the procedures set forth in the IDEA. (*Id.* at 18). Each of these "was not reasonably calculated to provide the Student with some and meaningful educational benefit and violated FAPE, impeded the Student's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding this provision of FAPE, caused a deprivation of educational benefit, and resulted in substantive harm for which compensatory services are appropriate." (*Id.* At 18-19).

The Hearing Officer awarded F.G. compensatory educational services from the LEA

> to provide the student with the education benefits which the student should have received had the district provided the services in the first place, while considering the present special educational and related services the Student is receiving, the Student's 14 years of age and special needs, and a balance between formal school and life.

(*Id.* at 19). The Hearing Officer awarded 4.5 hours of speech and language services in a segregated small group setting to account for the 9 hours of such services not provided, but factored in the reimbursement for private tutoring that was also awarded. (*Id.* at 19-20). He also awarded 7.2 hours of occupational therapy. (*Id.* at 20). The Hearing Officer awarded F.G. 201.6 hours of special education services in a segregated setting for reading, writing, and math skills. (*Id.* at 19). Apparently elaborating on his

methodology, the Hearing Officer wrote "360 hours at a 36 week school year of 10 hours minus 160 hours provided by [private tutors], plus 1.6 hours to round off schedule of services figure." (*Id.* at 19).  The Hearing Officer stated that the 201.6 hours would be spread out equally over four school years while F.G. continues school, resulting in 1.4 hours of special education services per week. (*Id.*).  Finally, the Hearing Officer awarded F.G. and his parents the cost of Ms. Lowe's private evaluation of F.G., ostensibly because the 2010 IEP relied on the results from this private evaluation. (*Id.* at 20).

The Hearing Officer also found that 21st Century and Garfield Middle School are schools within the parent LEA, making the "LEA the real party in interest as the parent district." (*Id.* at 17).

## II.   IDEA

### a. Background of IDEA

The purpose of IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).  The FAPE required by IDEA is tailored to the unique needs of the student by the implementation of an individualized educational program.  20 U.S.C. § 1414(d)(1)(A)(i).  Prepared through a collaborative process involving the student's parents, the student's regular education teacher, a special education teacher, a representative of the local educational agency, and an individual who can evaluate the various assessments of the student conducted

prior to the IEP meeting, the IEP is a written document that states the basic plan and goals for the student's education over the academic year.  20 U.S.C. § 1414(d)(1)(A)-(B).

IDEA contains procedural safeguards to ensure that the student's parents are involved in the development of the IEP.  *See* 20 U.S.C. § 1414(d)(3) & § 1415(a)-(d).  If the parents believe that a school district has violated IDEA's procedural safeguards or failed to provide their child with a FAPE, they can seek a due process hearing.  *See* 20 U.S.C. § 1415(f); *Sytsema ex rel. Sytsema v.Academy Sch. Dist. No. 20*, 538 F.3d 1306, 1312 (10th Cir. 2008).  After the due process hearing, any aggrieved party can seek judicial review.  *See* 20 U.S.C. § 1415(i)(2).

            *b.  Standard of Review Under IDEA*

The IDEA sets up a unique standard for a federal court's review of the administrative due process hearing. 20 U.S.C. § 1415(i)(2). A district court applies a modified *de novo* standard in reviewing a hearing officer's decision under IDEA.  *Murray v. Montrose County Sch. Dist.,* 51 F.3d 921, 927 (10th Cir.1995).  The court looks at the record of the administrative proceedings and decides, based on a preponderance of the evidence, whether the requirements of the IDEA are met. *Id.* The preponderance of the evidence standard in this context does not grant the reviewing court unfettered *de novo* review. *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley,* 458 U.S. 176, 206 (1982) ("Thus the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school

authorities which they review."). The court must give "due weight" to the hearing officer's findings of fact, which are considered *prima facie* correct. *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004). Although the district court may accept additional evidence, such evidence is merely supplemental to the administrative record. *See* 20 U.S.C. § 1415(i)(2)(B); *L.B.*, 379 F.3d at 974. The district court's proceedings must maintain the character of review and not rise to the level of a *de novo* trial. *L.B.*, 379 F.3d at 974. However, the district court reviews questions of law *de novo*. *See O'Toole v. Olathe Dist. Sch. Unified Sch. Dist. No. 233*, 144 F.3d 692, 698 (10th Cir. 1998). The party challenging the Hearing Officer's Decision bears the burden of proof. *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 521 (D.C.Cir. 2005).

### III.   Analysis

Defendants move for a judgment reversing the Hearing Officer's Decision. They argue that the Hearing Officer erred by applying the wrong standard for evaluating whether 21st Century provided F.G. with a FAPE in reading; awarding compensatory education based upon an hour for hour calculation; wrongfully ordering the school to pay for a private educational evaluation when Plaintiffs did not disagree with the school's evaluation; and finding APS liable for the alleged acts or omissions of 21st Century. Plaintiffs assert that the Hearing Officer did not err in his decision. Defendants' claims are considered below.

   *a. Did the Hearing Officer Apply the Wrong Standard for Assessing Whether F.G. Received a FAPE?*
Defendants claim that the Hearing Officer applied the wrong legal standard for a FAPE, stating that, under *Rowley*, the correct standard is "whether the instruction is

reasonably calculated to enable the student to make educational gains." (Doc. 16 at 3). Defendants claim that F.G. received a FAPE because he received some educational benefit from the educational services he received from 21st Century. (*Id.* at 3). According to Defendants, the Hearing Officer "abandon[ed] an analysis of whether F.G. benefitted from instruction, and instead [found] that the reading instruction that 21st Century provided was inadequate" based on incorrect factual findings. (*Id.* at 4). Defendants claim that the Hearing Officer incorrectly found that F.G.'s reading instruction was provided in a full inclusion setting, wrongfully found that F.G. regressed from a third grade level to a first grade reading level by misunderstanding the evidence regarding his test scores, and discounted the evidence that F.G. made progress in reading. (*Id.*).

Plaintiffs argue that the standard as presented by Defendants is incomplete and applies to "disputes concerning the development and contents of an IEP," whereas Plaintiffs challenged Defendants' material failure to implement the IEP. (Doc. 23 at 5). Additionally, Plaintiffs assert that the Hearing Officer's finding that F.G. did not receive the educational benefit intended by his IEP are supported by a preponderance of the evidence. (*Id.* at 6). Plaintiffs also claim that Defendants unilaterally changed F.G.'s IEP outside of an IEP team meeting, resulting in a procedural violation that denied F.G. a FAPE. (*Id.* at 16).[2]

The Supreme Court developed a two part inquiry to assess whether educational

---

[2] Because the Court recommends that *Defendants' Motion for Judgment Reversing the Hearing Officer's Decision* be denied on this issue, Plaintiff's assertion that the unilateral change to F.G.'s IEP is a procedural violation is not discussed. However, the Court will note briefly that the argument that a failure to implement an IEP is actually a unilateral change to an IEP and therefore a procedural violation has been rejected. *See Van Duyn*, 502 F.3d at 819.

services provided by a school district offer a FAPE.  *Rowley*, 458 U.S. at 206-07.  The

first step is to determine whether the school district has complied with the procedures

set forth in IDEA.  *Id.* at 206.  The second step is to evaluate whether the IEP is

reasonably calculated to enable the child to receive educational benefits.  *Id.* 206-07.  In

*Rowley*, a case in which the parents of a deaf child were challenging the substance of

the IEP as not designed to help their child maximize her potential, the Supreme Court

held that the requirement to provide a FAPE was satisfied by "providing personalized

instruction with sufficient support services to permit the child to benefit educationally

from that instruction. Such instruction and services . . . must approximate the grade

levels used in the State's regular education, and must comport with the child's IEP."  *Id.*

at 203.  At the hearing, the burden of proof rests on the party challenging the IEP.

*Johnson v. Indep. Sch. Dist. No. 4*, 921 F.2d 1022, 1026 (10th Cir. 1990).

        In *Sytsema*, the Tenth Circuit considered whether a school district violated IDEA

because a student's IEP was never finalized after the parents disagreed with some of its

substantive provisions.  *Sytsema*, 538 F.3d at 1310-1311.  In considering whether a

procedural defect amounted to a substantive failure under IDEA, the court explained the

analysis under Rowley.  *Id.* at 1313.  "The IEP complies with the Act's substantive

standards if it provides the disabled student with a basic floor of opportunity . . . . This

court has interpreted the *Rowley* standard to require an educational benefit that is more

than de minimus."  *Id.* (internal quotations omitted).  In *Sytsema*, the Tenth Circuit

applied the standard adopted in *Rowley*: "the education to which access is provided

must be sufficient to confer *some educational benefit*."  *Id.* (emphasis in original).

13

The Court of Appeals for the Ninth Circuit has held that a school district that fails to implement an IEP exactly does not violate IDEA "unless it is shown to have materially failed to implement the child's IEP." *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 815 (9th Cir. 2007). The court explained that "[a] material failure occurs when there is more than a minor discrepancy between the services provided to a disabled child and those required by the IEP." *Id.* at 815. The court reasoned that the language of IDEA that allows a party to challenge an IEP on substantive grounds indicates that the statute allows a claim that the failure to implement an IEP denied a child a FAPE. *Id.* at 821. However, the statute also does not require "perfect adherence to the IEP." *Id.* The court supported its holding that a minor failure to implement an IEP is not a violation of IDEA by analogizing from the Supreme Court's reasoning in *Rowley* that "minor failures in following IDEA's procedural requirements should not automatically be treated as violations of the statute." *Id.* Finding additional support for its holding, the court cited cases decided by the Courts of Appeals for the Fifth and Eighth Circuits, explaining that the holdings in those cases were consistent with the statutory text and *Rowley*. *Id.*; *see also Neosho R-V School Dist. v. Clark*, 315 F.3d 1022 (8th Cir. 2003); *Houston Independent School Dist. v. Bobby R.*, 200 F.3d 341 (5th Cir. 2000).

The Court of Appeals for the Fourth Circuit also held that the failure to implement a material portion of an IEP can amount to a denial of a FAPE. *Sumter Cty. Sch. Dist. v. Heffernan ex. rel. TH*, 642 F.3d 478 (4th Cir. 2011). The court found that even where the student made some gains in certain skill areas, the gains were not so significant as

14

to require a conclusion that the student received a non-trivial benefit from the imperfectly implemented IEP.  *Id.* at 486.  In *Van Duyn*, the court clarified that "the materiality standard *does not require* that the child suffer demonstrable educational harm in order to prevail.  However, the child's educational progress, or lack of it, may be probative of whether there has been more than a minor shortfall in the services provided."  *Van Duyn,* 502 F.3d at 822 (emphasis added).

Defendants argue that the Tenth Circuit has "consistently applied the *Rowley* standard to failure to implement claims" and cite two cases to support this argument, *Garcia v. Bd. of Educ. of the Albuquerque Pub. Sch.*, 520 F.3d 1116 (10th Cir. 2008) and *L.C. v. Utah State Bd. of Educ.*, 125 Fed. App'x 252 (10th Cir. 2005).  It is not clear why Defendants cite *Garcia*, as the plaintiffs in that case argued that the school district violated IDEA by failing to update the student's IEP, not that the school district was failing to implement the student's IEP.  *Garcia*, 520 F.3d at 1125-26.  In *L.C.*, the plaintiffs did argue that the school failed to properly implement the student's IEP.  L.C., 125 Fed. App'x at 260.  However, the court did not cite any standard for evaluating these claims, and simply found that the school's "deviations [did] not amount to a clear failure."  *Id.*  Because *L.C.* is not a published case, was decided before *Van Duyn*, and determined only that the school's conduct was not a failure to implement the IEP, as opposed to analyzing whether the school's failure to implement an IEP was a violation of the FAPE standard, the Court is not persuaded by Defendants' argument that the Tenth Circuit has "consistently applied the *Rowley* standard to failure to implement claims."  (Doc. 24 at 1).

15

The Court concludes that a claim that the school district has failed to fully implement an IEP should be considered under the material failure standard adopted by the Fourth, Fifth, Eighth, and Ninth Circuit Courts of Appeals.  Under this standard, when the discrepancy between the services the school district provides and the student's IEP is material, and the student suffers harm, or receives only a trivial educational benefit, the school district has denied the student a FAPE and violated IDEA.

Defendants argue that it would be "silly" to construe the FAPE standard to be satisfied if the plan is designed to confer an educational benefit but to find a violation when the services provided confer an educational benefit.  (*Id.* at 1).  This contention ignores the cases that hold that an educational benefit must be more than de minimus; applying Defendants statement literally would allow the FAPE standard to be satisfied if the students receives any educational benefit, even a trivial benefit.  This is a misrepresentation of the standard.  *See Rowley*, 458 U.S. at 206; *Van Duyn*, 502 F. 3d at 822; *Sytsema*, 538 F.3d at 1313.

Defendants contend that the Hearing Officer failed to make a finding that Defendants materially failed to implement F.G.'s IEP and caused him educational harm. However, in his decision, the Hearing Officer stated that the "lack of provision of the special education and related services prescribed by his March 20, 2009 IEP caused [F.G.] educational harm by creating larger gaps between [F.G.] and his peers and by creating gaps in his study skills.  (HO Decision at 16).  Under the standard of review, the Court must give due weight to the Hearing Officer's factual findings if supported by the

16

preponderance of the evidence.  *See Rowley*, 458 U.S. at 206.

The Hearing Officer made several findings that Defendants failed to fully implement F.G.'s IEP, including findings that F.G. did not receive reading instruction in small enough groups or with the frequency prescribed by the IEP.  (HO Decision at 8-9). Defendants argue that the Hearing Officer incorrectly found that a small group should contain two to five students, and claim that the state regulations explain what constitutes a small group.  (Doc. 16 at 5).  Although Defendants did not provide a citation for the state regulations, Plaintiff do cite these regulations, and correctly point out that they do not explain what constitutes a small group, but instead provide an upper ratio for the number of students for whom a teacher has responsibility.  N.M. Admin. Code § 29.1.9(H) (regulation states that the student/staff *caseload* shall not exceed 8:1. . .) (emphasis added).  A teacher's caseload is not necessarily the same as the class size.  Finally, Defendants do not point to anything in the record that suggests that the Hearing Officer should not have credited Ms. Lowe's testimony as to the size of a small group, or anything that conflicts with her testimony.  The record also supports the Hearing Officer's findings that the frequency of reading instruction provided to F.G. did not comport with the IEP.  In fact,  there was testimony that his reading instruction was decreased halfway through the year because F.G. showed progress, but was not increased when his progress slowed after his move to reading instruction two days a week.

In addition to finding that Defendants failed to fully implement the IEP, the Hearing Officer also found that F.G. suffered educational harm.  Both F.G.'s 2009 and

2010 IEPs placed his reading skills at the second to third grade level.  The 2009 IEP

was based on assessments done in the 2008-2009 school year; the 2010 IEP was

based on an evaluation done in November 2009.  (Ex. A; Ex. 2).  F.G.'s standardized

test scores in reading during the 2009-2010 school year did increase from 172 to 179,

an increase of 7 points while the typical increase of his peers was 12.  (Ex. R at

21[st]0112).  However, these scores place F.G. in the first percentile of his peers, and are

actually at a first grade reading level.  (Ex. J at 21[st]0157).  The Hearing Officer found

that F.G.'s score of 179 was a regression to the first grade level, which is incorrect as

the score was actually a small increase over his earlier tests; the Hearing Officer was

likely comparing it to the other assessments that placed F.G.'s reading at the third grade

level.  Despite this error, the record reflects that F.G. made almost no progress in his

reading.  An increase of a few points on his standardized tests that are not reflected by

any change in percentile, and continue to place him at a first grade level is a trivial

benefit.  Moreover, F.G. began receiving private, one-on-one tutoring before taking the

test in the spring of 2010, which most likely accounts for the small amount of progress

he did make.  On the whole, the record shows that F.G. made only trivial progress in his

reading skills over the course of the 2009-2010 school year; a student who receives a

de minimus benefit is denied a FAPE under IDEA.  *See Sytsema*, 538 F.3d at 1313.

Defendants' failed to provide F.G. with adequate reading instruction as prescribed in the

2009 IEP; this was a material failure that caused F.G. educational harm.

       After reviewing the administrative record and giving due weight to the Hearing

Officer's factual findings that are supported by a preponderance of the evidence, and

reviewing the relevant law, the Court recommends that Defendants' Motion to Reverse the Hearing Officer's Decision be denied as to whether the Hearing Officer applied the wrong standard for assessing whether F.G. received a FAPE.

   b.  *Did the Hearing Officer Erroneously Apply an Hour-for-Hour Remedy?*

   Defendants claim that the Hearing Officer incorrectly used an hour-for-hour calculation to determine the compensatory education award of 201.6 hours of special education services in a segregated setting for reading, math, and writing.  (Doc. 16 at 10-14).  Defendants argue that, by awarding F.G. the total number of hours of special education services he should have received based on the 2009 IEP (and offsetting this amount by the reimbursed private tutoring), the Hearing Officer gave no value to the instruction 21st Century did provide.  (*Id.* at 11).  Additionally, Defendants claim that the Hearing Officer did not undertake a qualitative analysis of the expected educational benefit F.G. would have received from the educational services as prescribed by his IEP and shape the compensatory education award in a way that would compensate for the actual harm suffered.  (*Id.* at 13-14).  Plaintiffs contend that the Hearing Officer did not mechanically apply an hour-for-hour remedy or err by not crediting Defendants for any benefit for the services they did provide.

   Courts and hearing officers may award compensatory education services to compensate for a past deficient program.  *Reid*, 401 F.3d at 522; *see also Meza v. Board of Education of the Portales Municipal Sch.*, 2011 U.S. Dist. LEXIS 31061, at **36-48 (D.N.M. 2011).  However, courts and hearing officers do not have unlimited discretion in determining equitable relief under IDEA; the remedy must be connected to

19

the record.  Meza, 2011 U.S. Dist. LEXIS 31061, at *39.  As one court explained,

"compensatory education involves discretionary, prospective, injunctive relief crafted . . .

to remedy . . . an education deficit created by an educational agency's failure . . . to

provide a FAPE to a student."  *Reid*, 401 F.3d at 524.  An hour-for-hour formula is not

reflective of equity jurisdiction, for which the goal is to be flexible and shape the remedy

to the necessities of the case.  *Id.* at 523-24.  "Appropriate relief is relief designed to

ensure that the student is appropriately educated within the meaning of the IDEA."  *Id.* at

524.  "As IDEA itself states, the statute's aim is to guarantee disabled students

specialized education and related services *designed to meet their unique needs*."  *Id.*

(internal quotations omitted); *see* 20 U.S.C. § 1400(d)(1)(A) (emphasis added).

　　　In this case, the Hearing Officer wrote that the compensatory educational

services he was awarding were "reasonably calculated to provide the student with the

educational benefits [F.G.] should have received had the district provided the services in

the first place," and that he had considered the present services the student was

receiving.  (HO Decision at 19).  However, when detailing the award of compensatory

special education services for reading, writing, and math, the number of hours awarded

was derived by a simple formula of the hours prescribed by the IEP multiplied by the

number of weeks in a school year, offset by the private tutoring that F.G. received.  The

Hearing Officer did not explain how the compensatory education award would

compensate F.G. for the deficit created by Defendants' failure to fully implement the

2009 IEP.  Equitable relief must not only be supported by the record, but must actually

involve a remedy designed to reflect the specific needs of the child.  Notwithstanding

20

the Hearing Officer's boilerplate sentence that he had considered the education benefits F.G. should have received, there is no evidence in the Hearing Officer's Decision that he crafted the remedy to compensate F.G. for his specific educational deficits.  This is further reflected by the Hearing Officer's determination that the number of hours of compensatory educational services provided per week is simply the total awarded divided by the number of weeks of education F.G. would receive in the future.  The Hearing Officer does not refer to testimony or documents in the record that show that an equal division of the services over four years would be most beneficial to F.G.  In fact, some testimony in the record suggests that more intensive educational services might provide F.G. with greater educational gains.

Because the Hearing Officer did not thoroughly consider F.G.'s unique educational needs, the Court recommends that his decision be reversed as to the compensatory award.  The Court further recommends that the issue be remanded to the Hearing Officer for the determination of a compensatory award that considers F.G.'s unique educational needs, including his present educational services and the specific educational deficits resulting from Defendants failure to fully implement his IEP.  *See Reid*, 401 F.3d at 526 (directing the Court to fashion an appropriate compensatory education award or remand to the hearing officer for further proceedings in the absence of pertinent findings and given that neither party submitted additional evidence for consideration.)

> c.  *Did the Hearing Officer Err by Ordering the School to Pay for a Private Evaluation?*

Pursuant to IDEA, Hearing Officers have authority to grant appropriate relief

based on their findings.  28 U.S.C. § 1415(e)(2).  Under the regulations governing independent educational evaluations, the parents of a child with a disability may seek an independent educational evaluation of their child.  34 C.F.R. § 300.502(a)(1).  The evaluation may be done at public expense when the parents disagree with the evaluation of the child obtained by the public agency.  34 C.F.R. § 300.502(a)(1).

The Hearing Officer concluded that Defendants should reimburse Plaintiffs for the cost of a private evaluation of F.G. conducted on February 24, 2010.[3]  (HO Decision at 20).   The Hearing Officer wrote that the evaluation was relied upon by the October 25, 2010 IEP and referenced *J.P. v. Anchorage Sch. Dist.*, 260 P.3d 285 (Alaska 2011). In *J.P.*, the court awarded the costs of a private evaluation when the school district failed to act upon the parents' request for one within the statutory time period and used some of the testing associated with the private evaluation in its own evaluation, thus eliminating at least some of the expense for the later evaluation.  *J.P.*, 260 P.3d at 293-95.

In this case, the Hearing Officer specifically found – and neither party contests – that Plaintiffs did not obtain the private evaluation because they disagreed with the school's evaluation.  (HO Decision at 13).   Therefore, the school was not obligated to pay for an independent evaluation on the basis that the parents disagreed, as required by 34 C.F.R. § 300.502(a)(1). The Hearing Officer's only finding regarding the private evaluation was that it was used in developing the October 2010 IEP.  (HO Decision at 13).  The regulations contemplate a situation where the parents have initiated an

---

[3] The HO Decision actually says February 24, 2009 but this is an error.  The evaluation took place in February 2010.  (HO Decision at 13).

independent evaluation at private expense; in this situation, the private evaluation must be considered "in any decision made with respect to the provision of FAPE to the child." 34 C.F.R. § 300.502(c).  The regulations do not require that the school reimburse the parents for an independent evaluation that was voluntarily obtained and subsequently used to develop the child's IEP.

Plaintiffs assert that the Hearing Officer correctly exercised his equitable powers in ordering reimbursement because Defendants "substantially delayed" providing Plaintiffs with a report of the speech evaluation.  (Doc. 23 at 27).  They state that "F.G. was six months past his three year August 2009 evaluation date" when they obtained the private speech evaluation and that they did not receive a copy of the school's speech evaluation report until March 2010.  (*Id.*).  Plaintiffs support this claim with a citation to the transcript from the hearing.  (*Id.*).  Notwithstanding Plaintiffs' misleading suggestion that Defendants failed to evaluate F.G. for six months, the record reveals that F.G. received speech and language testing on November 17, 2009.  (Ex. E, Tr. at 109-112).  Ms. Triolo, the IEP coordinator, testified that Plaintiffs' would have received the evaluation at the IEP meeting, which was initially scheduled for February 2, 2010 and later postponed due to scheduling conflicts on the part of both the school and parents.  (Tr. at 111-113; Ex. V).   Because Plaintiffs' did not disagree with the results of the testing, and part of the delay in receiving the results was due to Plaintiffs' conduct, the Court recommends that the Hearing Officer's Decision be reversed as to the reimbursement for the private evaluation.

### d.  Did the Hearing Officer Err in Finding APS Liable?

Defendants claim that the Hearing Officer erred in finding that, as a matter of law, Defendant APS is liable for the denial of a FAPE to F.G.  (Doc. 16 at 17).  Defendants claim that the New Mexico Charter School Act provides that federal IDEA funds go exclusively to the charter school, that the charter school and school district are distinct entities, and that the "plain language of New Mexico Charter School Act provides that a charter school in New Mexico is to be treated as an independent school."  (*Id.* at 18).  Plaintiffs contend that APS is the Local Educational Agency ("LEA") for 21st Century and that under federal and state regulations, APS is responsible for providing a FAPE to F.G.  (Doc. 23 at 28-29).

Children with disabilities who attend public charter schools, and their parents, retain all their rights under IDEA.  34 C.F.R. § 300.209(a) (2006).  The regulations distinguish between charter schools that are public schools of the LEA, public charter schools that are LEAs, and public charter schools that are neither an LEA nor a school that is part of an LEA.  34 C.F.R. § 300.209(b)-(d) (2006).  A public charter school that is an LEA is responsible for ensuring that the requirements of IDEA are met.  34 C.F.R. § 300.209(c) (2006).  However, when a charter school is a public school of the LEA that receives funding under § 300.705 and includes other public schools, the LEA is responsible for ensuring that children with disabilities that attend charter schools are served in the same manner as the LEA serves children with disabilities in its other schools, "unless State law assigns that responsibility to some other entity."  34 C.F.R. § 300.209(b)(1)&(2).  IDEA funds are distributed to the state who subsequently distributes

funding to LEAs, or directly to charter schools that operate as LEAs.  34 C.F.R. §

300.705(a).  The New Mexico Administrative Code echoes the federal regulations:

> **I.** Children in charter schools.
>> **(1)** Pursuant to 34 CFR Sec. 300.209, children with disabilities who attend public charter schools and their parents retain all rights under Part B of IDEA.
>> **(2)** Charter schools that are public schools of the LEA:
>>> **(a)** the LEA must serve children with disabilities attending those charter schools in the same manner as the LEA serves children with disabilities in its other schools . . . and
>>> **(b)** the LEA must provide funds under Part B of IDEA to those charter schools on the same basis as the LEA provides funds to the LEA's other public schools, including proportional distribution based on relative enrollment of children with disabilities, and at the same time as the LEA distributes other federal funds to the LEA's other public schools, consistent with the state's charter school law; and
>>> **(c)** if the public charter school is a school of an LEA that receives funding under 34 CFR Sec. 300.705 and includes other public schools:
>>>> **(i)** the LEA is responsible for ensuring that the requirements of this part are met, unless state law assigns that responsibility to some other entity; and
>>>> **(ii)** the LEA must meet the requirements of Paragraph (2) of this subsection.
>> **(3)** Public charter schools that are LEAs. If the public charter school is an LEA, consistent with 34 CFR Sec. 300.28, that receives funding under 34 CFR Sec. 300.705, that charter school is responsible for ensuring that the requirements of this part are met, unless state law assigns that responsibility to some other entity.

N.M. Admin. Code § 6.31.2.11.

The New Mexico Charter School Act, N.M.S.A. 1978 § 22-8B-1. *et seq.*, states

that a charter school shall be governed by a governing body as set forth in the charter

contract and that the school is responsible for its own operation.  N.M.S.A. 1978 § 22-

8B-1(B) & (C).  The assets acquired by a locally chartered charter school revert to the

local school board upon termination of the charter.  N.M.S.A. 1978 § 22-8B-1(N).  The

governing body of the charter school may contract and sue and be sued; the local school board shall not be liable for any acts or omissions of the charter school. N.M.S.A. 1978 § 22-8B-1(P).  Students attending charter schools and their parents retain all of their rights under IDEA and its implementing state and federal rules and a "state-chartered charter school, as a local educational agency, shall assume responsibility for determining students' needs for special education and related services."  N.M.S.A. 1978 § 22-8B-1(T).

Defendants state that IDEA allows each state to determine whether its charter schools will operate as independent schools or sub-units of a school district.  (Doc. 16 at 18).  Under the federal regulations, states may designate the responsibility for ensuring that charter schools comply with the requirements of IDEA to a specific entity, otherwise the LEA or the state is responsible for ensuring that charter schools are complying.  *See* 34 C.F.R. §§ 300.209 & 300.705.  It appears that Defendants are arguing that the New Mexico Charter School Act has designated that each charter school is solely responsible for ensuring that it complies with IDEA by enacting statutory provisions that state that charter schools operate independently and the local school board cannot be held liable for the charter school's conduct.  (Doc. 16 at 18-19; Doc. 24 at 8-12).

There are several reasons as to why Defendants argument that the Hearing Officer erred in holding APS liable for the denial of a FAPE to F.G. under IDEA is not ultimately persuasive.  First, the federal and state regulations specifically contemplate charter schools' compliance with IDEA and who bears the ultimate responsibility to

ensuring compliance.  Responsibility lies with the LEA or the state.  See 24 C.F.R.
300.209(b)-(d).  A charter school can be its own LEA, and would therefore be
responsible for ensuring compliance.  *See* C.F.R. 300.209(c).

A charter school is an LEA when it has been established as an LEA under state
law.  34 C.F.R. § 300.28(b)(2).  Defendants do not directly assert that 21st Century is its
own LEA, though they attempt to imply that this is the case by citing statutory provisions
about a charter school's independent operation.  (Doc. 24 at 11).  However, New
Mexico's Charter School Act does not contain a provision that states that a charter
school is also an LEA.  *Compare* N.M.S.A. 1978 § 22-8B-1 *et seq*, *with R.B. ex rel.
Parent v. Mastery Charter School*, 762 F. Supp. 2d 745, 761 n.99 (D. Pa. 2010)
(dismissing claims under IDEA against school district because of state statute providing
that charter schools situated within public school districts are distinct and separate
LEAs).  In fact, the APS website explains that charter schools operate independently,
but under a performance contract with their authorizer, who holds the charter school
accountable.  *See Charter & Magnet Schools*, Albuquerque Public Schools,
http://www.aps.edu/charter-and-magnet-schools (last visited February 26, 2013).  The
website also names APS as an authorizer under which 21st Century operates.  *See
School Directory*, Albuquerque Public Schools, http://www.aps.edu/charter-and-magnet-
schools/schools/schools (last visited February 26, 2013).

Defendants suggest that because IDEA funds meant for 21st Century "merely
flow through APS to the charter school," 21st Century cannot be a charter school within
an LEA (APS) for purposes of N.M. Admin. Code § 6.31.2.11(I)(2)(a) (the LEA is

27

responsible for ensuring that requirements of IDEA are met if charter school is a public
school of the LEA).  Defendants cite N.M.S.A. 1978 § 22-8B-13(B), which states that the
money from a federal program generated by students enrolled at a locally chartered
charter school cannot be given to any other public school program, as proof that a
charter school under the act is not part of the LEA.  This is incorrect for two reasons.
First, the immediately preceding provision states that a school district may withhold and
use two percent of the funding allocated to the charter school for the administrative
support of a charter school.  N.M.S.A. 1978 § 22-8B-13(A). This suggests that the
charter school is not entirely financially independent from the LEA and, at the very least,
funding for the charter school is dispersed via the school district.  This does not support
an argument that the charter school is its own LEA.   Second, under the federal
regulations, a charter school that is a public school of the LEA is one that receives IDEA
funding that goes first to the state, then to the LEA, and finally to the individual schools .
*See* 34 C.F.R. § 300.209(b); 34 C.F.R. § 300.705(a).  The Defendants' argument that
the funding merely flows through APS is precisely the situation addressed in these
regulations and does not conclusively show that 21st Century is its own LEA. [4]

Defendants emphasize that the Charter School Act specifically states that the
school district cannot be held liable for the conduct of a charter school.  (Doc. 16 at 17-
18; Doc. 24 at 11).  Taken in isolation, that provision does suggest that APS cannot be
held liable for the acts of 21st Century.  However, the statute also specifically addresses
a charter school's need to comply with IDEA, stating that children with disabilities and

---

[4] The Court notes that several Due Process Hearing Officers, including the one in this case, have also
determined that a charter school is not its own LEA.  *See Order Granting Petitioner's Motion to Add
Additional Party*, No. DPH 1011-28; Doc. 23-1; Doc. 23-2; Doc. 23-3.

their parents retain all of the rights under IDEA and "its implementing state and federal rules."  N.M.S.A. 1978 § 22-8B-4(T).  The legislature specifically incorporated the state and federal rules implementing IDEA, which include those outlined above that hold an LEA ultimately responsible for a charter school's compliance with IDEA.  Although Defendants correctly point out that a statute controls where it is in conflict with a regulation, *see Jones v. Employment Servs. Div.*, 95 N.M. 97, 99, 619 P.2d 542, 544 (N.M. 1980), in this case, that statute makes those state and federal regulations part of the Charter School Act.  N.M.S.A. 1978 § 22-8B-4(T).

The same provision also echoes the language of the regulations by specifically stating that a state-chartered charter school is a local educational agency and responsible for students' needs for special education.  *Id.*  Notably absent is any mention of a locally-chartered charter school.  *Id.*  Although the federal regulation allows a state, when dealing with a charter school within an LEA to the designate an entity other than the LEA to be responsible for ensuring a charter school's compliance with IDEA,   the legislature did not avail itself of that opportunity in this statute.  *See* C.F.R. § 300.209(b)(2)(i).

For all of the reasons explained above, Defendants have not demonstrated that the Hearing Officer erred in determining that APS could be held liable and the Court recommends that Defendants' Motion to Reverse the Hearing Officer's Decision be denied as to holding APS liable.

## IV.    Conclusion

For the reasons explained above, the Court recommends that Defendants'

Motion for Judgment Reversing the Hearing Officer's Decision be granted in part and denied in part.

<div style="border:1px solid black; padding:8px;">

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

</div>

_____
THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE

30